In re RICHARD POTASKY JEWELER, INC., Debtor.

Martin A. GREENBLATT, Appellant,

v.

RICHARD POTASKY JEWELER, INC., Appellee.

Bankruptcy No. 93–31896.
Nos. C–3–94–101, C–3–94–103, C–3–94–120 and C–3–94–541.
Adversary Nos. 93–0151, 93–0214.

United States District Court, S.D. Ohio, Western Division.

March 31, 1998.

Martin Greenblatt, Diamond Dealers Club, New York City, pro se.

Philip Eugene Langer, Porter, Wright, Morris & Arthur, Dayton, OH, for Richard Potasky Jeweler, Inc.

**DECISION AND ENTRY AFFIRMING IN PART AND REVERSING IN PART THE ORDER OF THE BANKRUPTCY COURT IN C–3–94–101, AFFIRMING THE ORDER OF THE BANKRUPTCY COURT IN C–3–94–103, REVERSING THE ORDER OF THE BANKRUPTCY COURT IN C–3–94–120, AND REVERSING THE ORDER OF THE BANKRUPTCY COURT IN C–3–94–541; JUDGMENT TO BE ENTERED ACCORDINGLY; TERMINATION ENTRY ON EACH OF FOUR CAPTIONED CAUSES**

RICE, Chief Judge.

## I. *INTRODUCTION*

"One of the primary purposes of the bankruptcy act is to 'relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes.'" *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934) (quoting *Williams v. U.S. Fidelity & Guar. Co.*, 236 U.S. 549, 554–55, 35 S.Ct. 289, 59 L.Ed. 713 (1915)); *see also* SEN. REP. No. 989, 95th Cong., 2d. Sess. 54–55 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5840–41. While the Bankruptcy Code ("Code") calms the financial seas surrounding the debtor, the same is not true of the rough financial waters surrounding other entities affiliated with the debtor. Absent the proper exercise of its equitable powers, a bankruptcy court does not operate as a *deus ex machina* for all the woes that beset third parties when a debtor files a petition in bankruptcy. *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 209, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988). The present case demonstrates this growing "tension between demands for bankruptcy court resolution of matters ranging far beyond debt restructuring and concerns over expanding the jurisdictional limits of bankruptcy courts in the federal court system." Howard C. Buschman III & Sean P. Madden, *The Power and Propriety of Bankruptcy Court Intervention in Actions Between Nondebtors*, 47 BUS. LAW. 913, 913 (1992).

## II. *FACTS*

Appellee, Richard Potasky Jeweler, Inc. ("Potasky Jeweler"), is an Ohio corporation which operates a chain of jewelry stores scattered through the Midwest and the Northeast. Appellant, Martin Greenblatt[1] ("Greenblatt"), is a consignment vendor of diamond jewelry who operates his business from the Diamond Dealers Club in New York City. From 1989 until mid-1993, Greenblatt and Potasky Jeweler regularly

---

1. Throughout the bankruptcy proceedings below and on appeal to this Court, Greenblatt has appeared pro se. The Court is mindful that "less stringent standards" apply when dealing with pro se pleadings. *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). However, "the lenient treatment accorded to pro se litigants has limits." *Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir.1996). These limits serve to deny pro se litigants any special treatment for their failure to comply with those legal requirements that are easily understood by a layman. "Of course, a pro se [litigant's] failure to satisfy an easily understood requirement, such as a date for the termination of discovery, deserves no special treatment from the courts." *Pilgrim*, 92 F.3d at 418 (Moore, J., dissenting).

conducted business with one another. During this period of time, Greenblatt provided diamond jewelry merchandise to Potasky Jeweler on consignment.[2] Before an item of consigned jewelry was sold, Potasky Jeweler would request the invoice for that item from Greenblatt in order to pass the title of the jewelry to the customer. After selling the jewelry, Potasky Jeweler would in turn remit the amount stated on the invoice to Greenblatt and retain for itself any additional profit from the sale.

While initially there were no problems, relations between the parties drew increasingly tense as Greenblatt became concerned over the financial condition of Potasky Jeweler. This concern stemmed from the increasing irregularity of Potasky Jeweler's "calling in" of invoices from Greenblatt. These tensions boiled over when Potasky Jeweler filed a petition for relief, pursuant to Chapter 11 of the Bankruptcy Code, on May 19, 1993.

On June 1, 1993, almost three weeks after Potasky Jeweler's petition in bankruptcy, Greenblatt initiated a suit in the Southern District of New York captioned *Martin Greenblatt v. Richard Potasky Jeweler, Inc.; Richard Potasky; Mark Scher; Jean Walther and Deloitte & Touche* ("First New York Lawsuit").[3] At the time he filed the suit, Greenblatt was aware that Potasky Jeweler had filed a petition in bankruptcy. Aside from Potasky Jeweler, the other named defendants in the suit were either officers, directors or employees of Potasky Jeweler. The gravamen of the suit was Potasky Jeweler's failure to inform Greenblatt of its poor financial condition near the end of 1992. Specifically, Greenblatt alleged that the defendants knew of Potasky Jeweler's poor financial condition, that this condition placed

consigned jewelry held by the debtor at risk, and that, despite their fiduciary obligations to him, the defendants failed to inform him of this situation.[4]

In response to the filing of the lawsuit, Potasky Jeweler initiated an adversary proceeding ("Adv.Pro.93–0151") against Greenblatt, seeking both preliminary and permanent injunctive relief as well as monetary damages for the appellant's violation of the automatic stay. On August 11, 1993, the bankruptcy court held a hearing to determine the propriety of granting the debtor's request for a preliminary injunction; Greenblatt, however, failed to attend the hearing. At the conclusion of the hearing, the bankruptcy court entered an order preliminarily enjoining the First New York Lawsuit in its entirety. For the next two months, both parties filed a salvo of motions with the bankruptcy court relating to a host of procedural issues, none of which is relevant to the resolution of the present appeals.[5]

After losing at the preliminary injunction hearing, Greenblatt took other measures. On October 4, 1993, he filed a proof of claim with the bankruptcy court and requested that the court establish a constructive trust over the consigned jewelry held by Potasky Jeweler. The court, however, denied Greenblatt's request. Without obtaining leave of the bankruptcy court, on October 22, 1993, Greenblatt filed a second lawsuit in the Southern District of New York entitled *Martin Greenblatt vs. Kurt Denkewalter; Philip E. Langer; Chernesky, Heyman & Kress; Richard Potasky; Mark Scher; and Jean Walther* ("Second New York Lawsuit"). Aside from the defendants named in the previous lawsuit, the remaining defendants

---

**2.** At no time did Greenblatt ever perfect a security interest on any of the items of jewelry he provided to Potasky Jeweler on consignment.

**3.** Deloitte & Touche was later dismissed from the suit by order of the district court. *Greenblatt v. Richard Potasky Jewelers*, 1994 WL 9754 (S.D.N.Y.1994).

**4.** In his complaint, Greenblatt alleged that this failure to inform constituted fraud, intent to defraud, conspiracy, misrepresentation, improper transfer of assets, conversion, embezzlement, breach of fiduciary duty and violations of the

Racketeer Influenced and Corrupt Organizations Act ("RICO").

**5.** On August 16, five days after the court's order preliminarily enjoining the First New York Lawsuit, Greenblatt filed his answer to the debtor's motion seeking the preliminary injunction as well as his objection to the court's granting of the injunction. On August 30, Greenblatt also filed a motion to reconsider as well as a motion for summary judgment. Afterwards, each party filed a variety of motions seeking to have the other's motions stricken as unresponsive.

served as the court appointed bankruptcy counsel for Potasky Jeweler. Greenblatt's complaint alleged that the debtor's attorneys had called him at his home ostensibly to discuss issues surrounding Adv. Pro. No. 93–0151, but in reality to harass him.[6] In response to the filing of this lawsuit, Potasky Jeweler initiated another adversary proceeding ("Adv.Pro. No. 93–214") against Greenblatt. In this adversary proceeding, as in the previous one, Potasky Jeweler sought preliminary and permanent injunctive relief as well as monetary damages. On November 29, 1993, Greenblatt filed a motion for a jury trial and a motion for summary judgment. In order to bring an end to the peripheral matters that were increasingly dominating its time, the bankruptcy court set January 14, 1994, as the date for a trial on most of the issues contained in both adversary proceedings.[7] In the interim, the bankruptcy court confirmed Potasky Jeweler's plan for reorganization.

Greenblatt failed to attend the trial. After the trial, on January 25, 1994, the bankruptcy court entered written orders relating to both adversary proceedings. As to Adv. Pro. No. 93–0151, the bankruptcy court determined that the First New York Lawsuit was void insofar as it applied to Potasky Jeweler and awarded the debtor damages in the amount of $5,847.76 for Greenblatt's violation of the automatic stay. Greenblatt has appealed this order of the bankruptcy court.[8] As to Adv. Pro. No. 93–214, the bankruptcy court permanently enjoined the appellant from pursuing the Second New York Lawsuit against any of the non-debtor defendants, denied his motion for summary judgment, denied his motion for a jury trial, awarded Potasky Jeweler $9,045.50 in damages (attorney's fees) for his failure to seek leave of the court when he initiated the Second New York Lawsuit, and directed him to dismiss with prejudice the Second New York Lawsuit within 10 days or be fined $100 a day. Greenblatt has also appealed this order of the bankruptcy court.[9] After entering these orders, the court held a hearing on February 7 in order to resolve all the remaining issues surrounding Adv. Pro. No. 93–0151. Not surprisingly, Greenblatt failed to appear at this hearing.

On February 15, the bankruptcy court entered a written order permanently enjoining Greenblatt from pursuing the First New York Lawsuit against any of the non-debtor defendants and directed him to dismiss with prejudice the First New York Lawsuit within 10 days or be fined $100 a day. Greenblatt has appealed this order of the bankruptcy court.[10] Despite these repeated attempts by the court to end the nagging troubles that had been surrounding the non-debtors affiliated with Potasky Jeweler, the troubles persisted. Greenblatt refused to dismiss either lawsuit and instead proceeded with litigating both suits in the Southern District of New York. As a result, on May 20, 1994, Potasky Jeweler filed with the bankruptcy court a motion for contempt of court and requested that the court impose sanctions against Greenblatt. On August 15, 1994, the bankruptcy court set a hearing to resolve Potasky Jeweler's motion and gave notice to Greenblatt to attend the hearing. On October 4, 1994, the bankruptcy court entered a written order finding that Greenblatt was in contempt of court and awarded $1128.50 to Potasky Jeweler, an amount representing attorney's fees as well as the other costs incurred by the debtor in pursuing the motion for contempt. Greenblatt has appealed this or-

---

**6.** In the Second New York Lawsuit, Greenblatt alleged causes of action for conspiracy, malicious prosecution, extortion to compromise settlement, abuse of process and invasion of privacy.

**7.** At the same time, the court also denied Greenblatt's motion for reconsideration of its order issuing the preliminary injunction and denying his request for the imposition of a constructive trust over the consigned jewelry in Adv. Pro. No. 93–0151. Greenblatt has not appealed this ruling.

**8.** This appeal forms the basis for Case No. C–3–94–103.

**9.** This appeal forms the basis for Case No. C–3–94–101.

**10.** This appeal forms the basis for Case No. C–3–94–120.

der as well.[11]

For the reasons set forth below, the order of the bankruptcy court in C–3–94–101 is affirmed in part and reversed in part, the order of the bankruptcy court in C–3–94–103 is affirmed, the order of the bankruptcy court in C–3–94–120 is reversed, and the order of the bankruptcy court in C–3–94–541 is reversed.

### III. JURISDICTION & STANDARD OF REVIEW

As these appeals arise from final orders of the bankruptcy court in core proceedings, *see* 28 U.S.C. § 157(b)(2)(A)(B)(C), this Court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1). While a bankruptcy court's findings of fact are reviewed under a clearly erroneous standard, its findings of law are reviewed *de novo*. *Mapother & Mapother, P.S.C. v. Cooper (In re Downs )*, 103 F.3d 472, 476–77 (6th Cir.1996); *Canadian Pac. Forest Prod. Ltd. v. J.D. Irving, Inc. (In re*

---

**11.** This appeal forms the basis for Case No. C–3–94–541.

**12.** Greenblatt has argued that the bankruptcy court made a number of misstatements of fact which underscore the court's prejudice against him. (Doc. # 18, pg. 37; C–3–94–101). This argument is without merit. The Court has reviewed each of the challenged statements and finds that not only was each not clearly erroneous but was in fact amply supported in the record.

The Court also notes that the appellant has argued that the bankruptcy court had no jurisdiction to issue its orders as they were issued after confirmation of the reorganization plan. This argument is without merit for two reasons. *First*, the mere fact that a bankruptcy court has confirmed a Chapter 11 plan "does not totally divest a bankruptcy court of all jurisdiction in the case." *Neptune World Wide Moving, Inc. v. Schneider Moving & Storage Co. (In re Neptune World Wide Moving, Inc.)*, 111 B.R. 457, 462 (Bankr.S.D.N.Y.1990). In fact, Bankruptcy Rule 3020(d) clearly states that a bankruptcy court retains jurisdiction over matters that were pending before the court prior to confirmation. *See* Committee Notes to Rule 3020(d) ("Subdivision (d) clarifies the authority of the court to conclude matters pending before it prior to confirmation ...."). The orders of the bankruptcy court that are the subject of this appeal arose from adversary proceedings that were initiated *prior* to confirmation. Therefore, the bankruptcy court had jurisdiction to conclude both adversary proceedings after it had confirmed the debtor's plan of reorganization.

---

*Gibson Group, Inc.)*, 66 F.3d 1436, 1440 (6th Cir.1995); *see also* Bankruptcy Rule 8013. However, where a bankruptcy court's determination involves a mixed question of law and fact, the district court "must break it down into its constituent parts and apply the appropriate standard of review for each part." *Wesbanco Bank Barnesville v. Rafoth (In re Baker & Getty Fin. Servs., Inc.)*, 106 F.3d 1255, 1259 (6th Cir.1997) (citing *Investors Credit Corp. v. Batie (In re Batie )*, 995 F.2d 85, 88 (6th Cir.1993)).[12]

### IV. DISCUSSION

**A.** *January 25, 1994 order relating to the Second New York Lawsuit (Case No. 94–101)*

Greenblatt has raised a number of arguments challenging various aspects of the bankruptcy court's order of January 25, 1994, that relate to the Second New York Lawsuit. These challenges concern the following: (1)

---

*Second,* the provisory clause contained in § 1141(b) makes allowance for a bankruptcy court to insert language in a confirmation order that authorizes it to retain jurisdiction over actions pending at the time of confirmation. *See Neptune World*, 111 B.R. at 462; *J.E. Jennings, Inc. v. William Carter Co. (In re J.E. Jennings, Inc.)*, 46 B.R. 167, 170 (Bankr.E.D.Pa.1985); *Centennial Indus., Inc. v. NCR Corp. (In re Centennial Indus., Inc.)*, 12 B.R. 99 (Bankr.S.D.N.Y. 1981). In this case, § 8.2 of the confirmed plan provides:

> Subject to the preceding section, the court shall retain jurisdiction in this case for the following purposes: ... (b) *determination of all causes of action, controversies, disputes, and conflicts involving the Debtor or its assets arising prior to the Effective date*, between the Debtor and any other party, including but not limited to, any right of the Debtor to recover assets pursuant to the provisions of the Bankruptcy Code

(Doc. # 32, pgs.22–23) (emphasis added). It is quite clear that an adversary proceeding by its very appellation falls within the category of a controversy, dispute, or conflict. *Cf. Minstar, Inc. v. Plastech Research, Inc. (In re Arctic Enterprises, Inc.)*, 68 B.R. 71, 75 (D.Minn.1986). Further, it is not disputed that the debtor had filed the adversary proceedings from which these appeals arose prior to confirmation. Therefore, by the terms of § 8.2 of the confirmed plan, the bankruptcy court did not lack jurisdiction when it resolved the adversary proceedings post-confirmation. Pursuant to § 1141(b), the court had retained such jurisdiction in the confirmation order.

the court's denial of Greenblatt's motion for summary judgment; (2) the awarding of attorney's fees for his failure to seek leave of the court before filing the lawsuit; (3) the court's denial of his motion for a jury trial; (4) the court's order permanently enjoining him from pursuing his suit against the non-debtor defendants; and (5) the court's order for him to dismiss the lawsuit with prejudice within 10 days or be fined $100 a day.

### 1. The denial of the motion for summary judgment

■ Greenblatt contends that Potasky Jeweler lacked standing to pursue an adversary proceeding against him and, therefore, the bankruptcy court erred in not granting his motion for summary judgment. Greenblatt asserts that when Potasky Jeweler filed for bankruptcy it ceased to exist as a separate entity. Therefore, only the attorney for the debtor in possession or the trustee (not the corporation itself) could initiate the adversary proceeding against him. (Doc. # 18, pgs. 15–16). This argument is premised upon a misconception of the consequences that a corporation's filing of a petition in bankruptcy has on its status as a separate legal entity. A petition for relief pursuant to Chapter 11 of the Code does not dissolve a corporation, but merely changes the appellation of the corporation to that of a debtor in possession. *See* 11 U.S.C. § 1101(1). While the rights and responsibilities of those who ran the corporation prior to the filing are altered, the status of the corporation as a separate legal entity remains unchanged. "[I]t is sensible to view the debtor-in-possession as the same 'entity' which existed before the filing of the bankruptcy petition, but empowered by virtue of the Bankruptcy Code to deal with its contracts and property in a manner it could not have employed absent the bankruptcy filing." *NLRB v. Bildisco and Bildisco,* 465 U.S. 513, 528, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984).

As a *debtor in possession,* Potasky Jeweler held nearly all of the powers a trustee in bankruptcy possesses, including the power to initiate an adversary proceeding. *See* 11 U.S.C. § 1107(a); *Canadian Pac.,* 66 F.3d at 1441; SEN. REP. NO. 989, 95th Cong., 2d Sess. 116 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5902 ( "[Section 1107(a)] places a debtor in possession in the shoes of a trustee in every way."). As Potasky Jeweler had standing to pursue the adversary proceeding, the court's denial of Greenblatt's motion for summary judgment was appropriate. *See Matter of Venegas Munoz,* 73 B.R. 283, 285 (Bankr. D.P.R.1987).

### 2. Appellant's failure to seek leave of the bankruptcy court before filing the suit

■ Greenblatt contends that the bankruptcy court improperly awarded attorney's fees to Potasky Jeweler for his failure to seek leave of the court before filing the Second New York Lawsuit. His argument is two fold. *First,* Greenblatt argues that he did not need to obtain leave of the court before filing the suit because the Second New York Lawsuit falls within the "carrying on business" exception of 28 U.S.C. § 959(a). (Doc. # 18, pgs. 27–28). *Second,* Greenblatt contends that even if he did need to obtain leave of the court, § 105(a) does not authorize a court to award attorney's fees. (Doc. # 18, pgs. 38–45).

#### a. The Barton rule

In *Barton v. Barbour,* 104 U.S. 126, 129, 26 L.Ed. 672 (1881), the Supreme Court held that a suit could not be maintained against a receiver for an act in his official capacity without first obtaining leave from the court which had appointed him. In *Vass v. Conron Bros. Co.,* 59 F.2d 969, 971 (2d Cir.1932). Judge Learned Hand applied this rule to an action against a trustee in bankruptcy. ("[A]n action against a trustee in bankruptcy for transactions of his own, must be brought in the bankruptcy court, unless it gives leave to liquidate elsewhere ....."). Since Judge Hand's decision in *Vass,* it has been well settled that the rule of *Barton v. Barbour* applies to bankruptcy proceedings. *See Allard v. Weitzman (In re DeLorean Motor Co.),* 991 F.2d 1236, 1240 (6th Cir.1993). Recently, the Sixth Circuit extended the application of the Barton rule to suits against the attorneys for a debtor. *See DeLorean,* 991 F.2d at 1241 ("We hold, as a matter of law, counsel for trustee, court appointed officers

who represent the estate, are the functional equivalent of a trustee ...."). It is undisputed that Greenblatt named the attorneys for Potasky Jeweler as defendants in the Second New York Lawsuit and that the suit was filed without leave of the bankruptcy court.

### b. The "carrying on business" exception

Greenblatt contends, however, that he did not need to obtain leave of the bankruptcy court before filing his suit, because the Second New York Lawsuit falls within the "carrying on business" exception to the Barton rule. 28 U.S.C. § 959(a) provides that:

Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property.

The phrase "carrying on business" has been interpreted narrowly by the courts. See DeLorean, 991 F.2d at 1240–41 ( "Section 959 serves as a limited exception to the above described rule (the 'Barton Doctrine') ...."); Rothberg v. Kirschenbaum (In re Beck Indus., Inc.), 725 F.2d 880, 887 (2nd Cir.1984) ("[T]his court has given § 959(a) a rather narrow construction."). "Merely collecting, taking steps to preserve, and/or holding assets, as well as other aspects of administering and liquidating the estate, do not constitute 'carrying on business' as that term has been judicially interpreted." DeLorean, 991 F.2d at 1241.

Greenblatt's suit against the attorneys for Potasky Jeweler was for actions they took that were wholly unrelated to the carrying on of the debtor's business. Indeed, the actions for which Greenblatt complains---the discussion of matters relating to the first adversary proceeding---were directly related to the administration of the debtor's estate. See In re American Associated Sys., Inc., 373 F.Supp. 977, 979 (E.D.Ky.1974) (holding that the prosecution of lawsuits by a trustee to reduce claims of the estate to money does not constitute carrying on business within the meaning of § 959(a)). In fact, Greenblatt concedes as much. (Doc. #18, pg.27) (The acts "had nothing to do with carrying on the business of the estate of the debtor."). Therefore, the Second New York Lawsuit does not fit within the carrying on business exception. Without the benefit of this exception, Greenblatt is required to seek leave of the bankruptcy court, prior to filing suit. Since Greenblatt did not do so, he may be held in contempt of court. See DeLorean, 991 F.2d at 1241.

### c. Awarding attorney's fees pursuant to section 105

■ Greenblatt argues that even if he was in contempt of court, the bankruptcy court could not award attorney's fees to the debtor because § 105(a) does not expressly authorize such awards. Greenblatt's argument regarding the proper statutory construction of § 105(a) is misplaced. In DeLorean the Sixth Circuit held that a bankruptcy court could award attorney's fees for a violation of the Barton rule. 991 F.2d at 1242 ( "The Trustee is entitled to the [attorney's fees] that he requested in Count I of his complaint."). Therefore, the court's order awarding attorney's fees to the debtor was appropriate.

### 3. The denial of the motion for a jury trial

■ Greenblatt contends that he was entitled to a jury trial in order to resolve the issues raised in the January 14, 1994, trial before the bankruptcy court. The question of whether a creditor has a Seventh Amendment right to a jury trial was addressed by the Supreme Court in Langenkamp v. Culp, 498 U.S. 42, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990). In Langenkamp the Court held that a creditor who files a proof of claim with the bankruptcy court has waived its right to a jury trial. As the Court stated:

Accordingly, 'a creditor's right to a jury trial ... depends upon whether the creditor has submitted a claim against the estate.' Respondents filed claims against the bankruptcy estate, thereby bringing themselves within the equitable jurisdiction of the Bankruptcy Court. Consequently, they were not entitled to a jury trial.

498 U.S. at 45, 111 S.Ct. 330; see also Longo v. McLaren (In re McLaren ), 3 F.3d 958, 961 (6th Cir.1993) ("[The creditor] was thus forced to initiate this dischargeability pro-

ceeding in bankruptcy court. Under *Grand-financiera,* [the creditor's] filing stripped him of any right to a jury trial he might otherwise have claimed."). In the present case, Greenblatt filed a proof of claim with the bankruptcy court on October 4, 1993. Because Greenblatt availed himself of the equitable jurisdiction of the bankruptcy court, he cannot complain of his consequent loss of the right to a jury trial.

### 4. *The authority to grant the permanent injunction pursuant to § 105* [13]

Greenblatt contends that the bankruptcy court had no authority to issue a permanent injunction that protects any of the non-debtor third parties to the Second New York Lawsuit, because such an injunction would in effect discharge the liability of those parties---a result specifically proscribed by § 524(e). Potasky Jeweler, however, argues that, despite the prohibition contained in § 524(e), the broad language of § 105(a) grants the necessary authority for the bankruptcy court to issue a permanent injunction for the benefit of the non-debtor third parties.

The circuits are split on whether a bankruptcy court can under any circumstances issue a permanent injunction that protects non-debtor third parties from liability. *Compare Resorts Int'l, Inc. v. Lowenschuss (In re Lowenschuss )*, 67 F.3d 1394, 1402 (9th Cir. 1995) (cannot); *Landsing Diversified Properties–II v. First Nat'l Bank & Trust Co. (In re Western Real Estate Fund, Inc.)*, 922 F.2d 592, 601 (10th Cir.1990) (cannot) *with Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 760–61 (5th Cir.1995) (can); *In re Specialty Equip. Cos., Inc.*, 3 F.3d 1043, 1046–47 (7th Cir.1993) (can); *Menard–Sanford v. Mabey (In re A.H. Robins Co.)*, 880 F.2d 694, 702 (4th Cir.1989) (can); *MacArthur Co. v. Johns–Manville Corp.*, 837 F.2d 89, 93 (2d Cir.1988) (can).[14] The underlying reason for this divergence stems from differing views on the preclusive effect of § 524(e) over the application of the broad equitable powers found in § 105(a). Similarly, the parties to the present case have presented arguments requiring this Court to determine which section of the Code— § 105(a) or § 524(e)— displaces the other. The Court rejects this all or nothing approach to resolving the perceived tug of war between § 105(a) and § 524(e), given that, when each section is given its plain meaning,[15] the apparent conflict between the two sections vanishes.

### a. *Section 524(e)*

Section 524(e) specifically provides that the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." Although on its face, § 524(e) does not set forth a *per se* rule prohibiting permanent injunctions which protect non-debtor third parties, some courts have so ruled by reference to § 524(e)'s predecessors---§ 16 and § 22(b) of the Bankruptcy Act of 1898. *See Resorts Int'l*, 67 F.3d at 1401; *American*

---

13. Greenblatt has also argued that the bankruptcy court could not issue a permanent injunction pursuant to § 362, because § 362 only protects debtors not non-debtors. (Doc. # 18, pgs.16–18). Apparently Greenblatt is confused as to the statutory authority the bankruptcy court relied upon to issue the permanent injunction. The court relied upon the broad equitable powers found in § 105(a) to issue the permanent injunction. Therefore, Greenblatt's arguments relating to § 362 are moot.

14. The Sixth Circuit has not ruled upon the issue of the propriety of granting a post-confirmation permanent injunction for the benefit of non-debtor third parties. *See American Imaging Servs., Inc. v. Eagle–Picher Indus., Inc. (In re Eagle–Picher Indus., Inc.)*, 963 F.2d 855 (6th Cir.1992) (discussing the criteria for granting *preliminary* injunctions); *Lynch v. Johns–Manville Sales Corp.*, 710 F.2d 1194 (6th Cir.1983) (same).

15. From its recent rulings, the Supreme Court has made it clear that when interpreting the provisions of the Code a court should be guided by the plain meaning of the statute. *See Pioneer Inv. Serv. Co. v. Brunswick Assocs. Ltd. Partnership*, 507 U.S. 380, 387–89, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993); *Patterson v. Shumate*, 504 U.S. 753, 757–58, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992); *United States v. Ron Pair Enter. Inc.*, 489 U.S. 235, 240–42, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). When the plain meaning of a statute is clear, the court's inquiry is at an end. *Ron Pair*, 489 U.S. at 240–42, 109 S.Ct. 1026. More importantly, a court should interpret the Code in a manner that avoids a conflict between its various sections. *Id.* at 245–47, 109 S.Ct. 1026.

*Hardwoods, Inc. v. Deutsche Credit Corp. (In re American Hardwoods, Inc.)*, 885 F.2d 621, 625 (9th Cir.1989).

Section 16 stated that "[t]he liability of a person who is a co-debtor with, or a guarantor of or in any matter a surety for, a bankrupt *shall* not be altered by the discharge of such bankrupt." (emphasis added). Section 22(b) provided that a corporation's discharge in bankruptcy "*shall* not release its officers, the members of its board of directors or trustees or other similar controlling bodies ... from any liability under the laws of a State or of the United States." (emphasis added). As a result of the mandatory language contained in those sections, courts operating under the Bankruptcy Act held that a bankruptcy court had no power to discharge the liabilities of any of the enumerated parties set forth in § 16 or § 22(b). *See Underhill v. Royal*, 769 F.2d 1426, 1432 (9th Cir. 1985); *Union Carbide Corp. v. Newboles*, 686 F.2d 593, 595 (7th Cir.1982); *R.I.D.C. Indus. Dev. Fund v. Snyder*, 539 F.2d 487, 494 (5th Cir.1976).

■ Unlike its predecessors, § 524(e) contains no explicit reference to which category of third party non-debtors it covers. As a result of this statutory silence, some "courts have gone further, [and] extended the juxtaposition of § 105 and § 524 to conclude that the interplay between them bars third party injunctions." *In re Sybaris Club Int'l, Inc.*, 189 B.R. 152, 156 (Bankr.N.D.Ill.1995). This leap of legal reasoning is unwarranted. Section 524(e) clearly allows the issuance of a permanent injunction to protect the property or the administration of the debtor's estate. *See Specialty Equip.*, 3 F.3d at 1046–47; *Western Real Estate*, 922 F.2d at 600; *American Hardwoods*, 885 F.2d at 625; *In re Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr.W.D.Mo.1994). Therefore, where a permanent injunction, regardless of the identity of its direct beneficiary, serves to protect the property or facilitate the administration of the debtor's estate, § 524(e) will not stand in the way of the court issuing the injunction.

**b. Section 105(a)**

■ Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." By its very terms, § 105(a) authorizes only court orders that are necessary to carry out the other provisions of the Code. *SeeWasserman v. Immormino (In re Granger Garage, Inc.)*, 921 F.2d 74, 77 (6th Cir.1990) ("Those equitable powers may only be exercised within the confines of the Bankruptcy Code."); *Zale Corp.*, 62 F.3d at 760 ("[A] § 105 injunction must be consistent with the rest of the Bankruptcy Code."); *American Hardwoods*, 885 F.2d at 625 ("[S]ection 105 does not authorize relief inconsistent with more specific law."); *Sybaris Clubs*, 189 B.R. at 155 ("Section 105, however, is merely a vehicle to carry out the otherwise provided powers of the bankruptcy court."). As the Supreme Court has noted, "whatever equitable powers remain in the bankruptcy courts must and *can only be exercised within the confines of the Bankruptcy Code.*" *Norwest Bank*, 485 U.S. at 206, 108 S.Ct. 963 (emphasis added). This inherent limitation on the reach of § 105 has an important implication: whatever relief a bankruptcy court fashions "must be firmly grounded in the Code and carefully tailored to serve the purposes contemplated by particular Code provisions." Howard C. Buschman III & Sean P. Madden, *The Power and Propriety of Bankruptcy Court Intervention in Actions Between Nondebtors*, 47 BUS. LAW. 913, 922 (1992). Therefore, § 105, standing alone, cannot serve as a source of authority for granting a permanent injunction. Rather, § 105 must be tethered to another section of the Code in order to provide the court with such authority. In the context of Chapter 11 proceedings, the key to granting a permanent injunction "has been whether the injunction requested was 'necessary or appropriate to carry out' the discharge provisions of [§ 1141.]" 2 COLLIER ON BANKRUPTCY ¶ 105.03[2][b][ii], at 105–43 (15th ed. rev. 1996).

■ Section 1141 states that "after confirmation of a plan, the *property dealt with by the plan* is free and clear of all claims and interests of creditors ...." 11 U.S.C.

§ 1141(a) (emphasis added).[16] Thus, § 1141 only allows the discharge of property belonging to the debtor's estate that is dealt with in the plan of reorganization. Accordingly, any permanent injunction granted pursuant to § 105(a) must have a direct and immediate connection to the property contained in or the administration of the debtor's plan of reorganization in order to be proper. *See Zale Corp.*, 62 F.3d at 760–61; *Sybaris Clubs*, 189 B.R. at 156–58; *Master Mortgage*, 168 B.R. at 934–35; 2 COLLIER ON BANKRUPTCY ¶ 105.03[2][b][ii][A] at 105–45 n. 84 (15th ed. rev.1996) ("To the extent that property is within the bankruptcy court's jurisdiction, section 105 permanent injunctions would seem to [be] 'necessary and appropriate' to ensure the effectiveness of the discharge of section 1141."). Any other reading would place the operation of § 105 in Chapter 11 proceedings outside the confines of the Code.

### c. Unusual circumstances test

As can be gleaned from the previous discussion, both § 105 and § 524(e) require that in order for a permanent injunction to be proper it must be directly connected to the property or the administration of the debtor's estate. Those courts holding that under "unusual circumstances" a bankruptcy court may grant a permanent injunction to relieve third party non-debtors from liability are not at odds with this principle. In the cases adopting the unusual circumstances test, the courts have noted that the following circumstances justified the granting of a permanent injunction:

(1) That the suit against the non-debtor was, in essence, a suit against the debtor or will deplete assets of the estate;

(2) The non-debtor contributed substantial assets to the debtor's estate as part of the debtor's plan of reorganization [17]; and

(3) The injunction is essential to reorganization. Without the injunction the entire reorganization plan would unravel.[18]

*See Master Mortgage*, 168 B.R. at 935; 2 COLLIER ON BANKRUPTCY ¶ 105.03[2][b][ii][A], at 105–44 to 105–45 (15th ed. rev.1996). Upon closer inspection, a common thread can be discerned running through all of these unusual circumstances—all are either connected to the property or to the administration of the debtor's estate.

In those cases where the courts found that unusual circumstances were present, the injunctions served either to marshal assets of the debtor's estate or to channel the claims of creditors to assets of that estate. The existence of these assets, however, depended

**16.** Section 1141, however, is not the only source of authority for a bankruptcy court to exercise the equitable powers found in § 105(a). As long as the bankruptcy court can find authorization for granting a permanent injunction elsewhere in the Code, the court has authority to issue the injunction. Another section of the Code arguably relevant to the granting of a permanent injunction is § 1123(b)(3). "The injunction also arguably promotes and is 'necessary and appropriate' to 'carry out the provisions' of section 1123(b)(3), which states that a plan of reorganization may provide for 'the settlement or adjustment of any claim or interest belonging to the debtor or to the estate.'" 2 COLLIER ON BANKRUPTCY ¶ 105.03[2][b][ii][C], at 105–46 n. 90 (15th ed. rev.1996).

**17.** On most occasions, this requires that the non-debtor provide full control over its assets and liabilities to the debtor. However, on some occasions, the amount of the contribution given to the debtor's estate by the non-debtor, while not complete, may nonetheless be sufficient if it meets an "index of good faith." *Cf. In re Master Mortgage*

*Inv. Fund, Inc.*, 168 B.R. 930 (Bankr.W.D.Mo. 1994) (contribution of assets worth well over four million dollars); *In re Specialty Equip. Cos.*, 3 F.3d 1043 (7th Cir.1993) (extension of over ten million dollars in credit to the debtor); *S.E.C. v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 960 F.2d 285 (2d Cir.1992) (creditor and debtor pooled their claims against officers and directors into a 1.3 billion dollar fund).

**18.** Courts have also found other factors to be important. Those factors are: (1) that a substantial majority of the creditors agreed to the injunction, specifically, the impacted class of creditors; (2) the plan for reorganization provided for full payment of the creditor's claims; and (3) the injunction affected only a small percentage of the claimants. These factors, however, were not necessary for the result the courts reached. "While these factors may have comforted the court that the plan was fair, they are not essential to the case's holding." 2 COLLIER ON BANKRUPTCY ¶ 105.03[2][b][ii][A], at 105–45 n. 84 (15th ed. rev.1996).

upon the action of a third party non-debtor. By permanently enjoining suits against these third party non-debtors, the courts created a legal environment that enabled the non-debtor to take the necessary steps which would lead to the creation of assets for the debtor's estate. "Since the insurance policies were estate assets, and there were legitimate arguments over coverage, the willingness of the insurers to settle, and have that settlement embodied in a plan, turned on the court's ability to make the settlement final, which required injunctions against the third parties." 2 COLLIER ON BANKRUPTCY ¶ 105.03[2][b][ii][C] at 105–46 n. 90 (15th ed. rev.1996). As the Second Circuit noted:

> [T]he injunctive orders do not offer the umbrella protection of a discharge in bankruptcy. Rather, they preclude only those suits against the settling insurers that arise out of or relate to [the debtor's] insurance policies. Moreover, claims against the insurers based on [the debtor's] policies are not extinguished; they are simply channeled away from the insurers and redirected at the proceeds of the settlement [between the insurers and the debtor].

*Manville*, 837 F.2d at 91. Thus, in all the cases where it was found that "unusual circumstances" were present, the courts were dealing with *property of the debtor's estate*—typically insurance policies—that had been infused into the estate by third parties as part of the overall plan for reorganization.[19]

Because the courts were dealing with property of the debtor's estate, § 524(e) clearly did not preclude the court from granting the injunction, nor did the granting of the injunction fall outside the discharge provisions of § 1141.

### d. *Application*

In the present case, Potasky Jeweler argues that maintenance of the Second New York Lawsuit would have a direct impact upon the administration and the property of the debtor's estate. As support for this assertion, it points to the following: (1) counsel for the debtor would have to waste time defending against a frivolous suit in a distant forum that could have been better spent helping to administer the debtor's plan of reorganization, and (2) the officers and directors of the debtor could seek indemnification from the debtor for the costs they incurred in defending against the suit and such a result would deplete assets of the debtor's estate.[20] (Doc. # 32, pgs. 16–17).

The Court finds these potential deleterious effects upon the property or the administration of the debtor's estate to be too tenuous to warrant granting a permanent injunction. As pointed out earlier, in order for a permanent injunction to be proper, a direct and immediate connection to the property or to the administration of the debtor's estate is needed. Litigating a peripheral matter in another forum, no matter how burdensome to

**19.** Such an arrangement between the debtor and its insurers was necessary because of the existence of pre-petition mass tort liabilities facing the debtor and its insurers. With the passage of § 524(g) in 1994, Congress provided bankruptcy courts a mechanism by which they could issue a permanent injunction for the benefit of third party non-debtors. However, § 524(g) dealt only with third party liabilities related to asbestos mass tort situations. The passage of § 524(g) does not, however, mean that § 524(e) denies such marshaling or channeling of relief in other situations. Section 111(b) of the Bankruptcy Reform Act of 1994 provides that:

> Nothing in subsection (a) [adding 524(g) and (h)], or in the amendments made by subsection (a), shall be construed to modify, impair, or supersede any other authority the court has to issue injunctions in connection with an order confirming a plan of reorganization.

Section 111(b) was intended by Congress to avoid any conjecture that, absent cases involving

asbestos, bankruptcy courts lacked the power to issue permanent injunctions. *See* 140 CONG. REC. H10,766 (daily ed. Oct. 4, 1994) (rem. of Rep. Brooks); 140 CONG. REC. S14,461 (daily ed. Oct. 6, 1994) (rem. Sen. Heflin). *But see Resorts Int'l*, 67 F.3d at 1402 n. 6.

**20.** The Court does not share Potasky Jeweler's concern about the possibility it may have to indemnify its officers and directors for their efforts in defending against the Second New York Lawsuit. When the debtor's plan for reorganization was confirmed by the court, any potential liability Potasky Jeweler faced with respect to indemnifying its officers and directors was extinguished. *See* 11 U.S.C. §§ 1141(d)(1)(A), 524(a), 103(a). "What is important to keep in mind is that discharge in bankruptcy does not extinguish the debt itself but merely *releases the debtor from personal liability ...." Western Real Estate*, 922 F.2d at 600 (emphasis added).

the individuals involved or how frivolous the lawsuit, does not rise to the level of immediacy or directness that is required. As one court noted when faced with a similar argument: "If we accepted such reasoning, we would enjoin such matters as divorce proceedings and other suits against corporate officers on personal matters. . . . Such an outcome 'stretches beyond the purpose and intent of Chapter 11' and, indeed, of the Code itself." *Apollo Molded Prods., Inc. v. Kleinman (In re Apollo Molded Prods., Inc.)*, 83 B.R. 189, 193 (Bankr.D.Mass.1988). Because the present case does not present any of the unusual circumstances that would warrant issuing a permanent injunction to protect a third party non-debtor, the bankruptcy court's order permanently enjoining Greenblatt from pursuing the Second New York Lawsuit was improper and is reversed.

5. *The order to dismiss the Second New York Lawsuit or pay a fine*

 Greenblatt has raised various arguments challenging the bankruptcy court's order requiring him to dismiss the Second New York Lawsuit or pay a fine. Resolution of these arguments, however, is not necessary in deciding this matter.

 Generally, the addressee of an injunction must comply with the injunction, even an invalid injunction, until the injunction is stayed or reversed by a higher court. *See Pasadena City Bd. of Education v. Spangler*, 427 U.S. 424, 439, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976). Failure to comply with the injunctive order is punishable by an order holding the violator in contempt of court. *Id.* However, when the underlying injunctive order is later found to be invalid, the validity of the contempt order comes into question. Whether the contempt order is valid in such a situation depends upon the particular nature of that order. "While the invalidity of a court order is generally not a defense in a criminal contempt proceeding alleging disobedience of the order, 'a finding of civil contempt is invalidated if the underlying order is invalidated.'" *Collins v. Barry*, 841 F.2d 1297, 1299 (6th Cir.1988) (quoting *Squillacote v. Local 248, Meat & Allied Food Workers*, 534 F.2d 735, 746 (7th Cir.1976)).

The distinction between civil and criminal contempt has been expressed as follows:

> The primary purpose of a criminal contempt is to punish defiance of a court's judicial authority. Accordingly, the normal beneficiaries of such an order are the courts and the public interest. On the other hand, civil contempt is characterized by the court's desire 'to *compel* obedience of the court order or to compensate the litigant for injuries sustained from the disobedience.' The remedial aspects outweigh the punitive considerations. Thus, the primary beneficiaries of such an order are the individual litigants. The judicial system benefits to a lesser extent.

*Collins*, 841 F.2d at 1300 (quoting *Ager v. Jane C. Stormont Hosp. and Training Sch. for Nurses*, 622 F.2d 496, 499–500 (10th Cir. 1980)). As the bankruptcy court's order sought to compel the appellant to obey the mandates of its injunctive order, the contempt order was civil in nature. Because the bankruptcy court had no authority to permanently enjoin the appellant from pursuing the Second New York Lawsuit, its order that the lawsuit be dismissed or that Greenblatt pay a fine necessarily falls as well.

WHEREFORE, the Orders of the Bankruptcy Court appealed in Case No. C–3–94–101 are affirmed in part and reversed in part. The Bankruptcy Court's Order permanently enjoining Appellant from pursuing the Second New York Lawsuit is reversed, insofar as the injunction benefits third party non-debtors, as is the Order of the Bankruptcy Court directing Appellant to dismiss the Second New York Lawsuit within ten days or pay a fine. In all other respects, the Order of the United States Bankruptcy Court is affirmed. Specifically, the judgment entered in favor of Appellee and against Appellant in the amount of $9,045.50 in attorneys fees, plus interest, as the result of the Appellee's failure to seek leave of the Bankruptcy Court when he initiated the Second New York Lawsuit, thus violating the automatic stay, is affirmed.

B. *January 25, 1994 order relating to the First New York Lawsuit (Case No. 94–103)*

Greenblatt has raised objections to the following aspects of the bankruptcy court's Jan-

uary 25, 1994, order relating to the First New York Lawsuit: (1) the declaration that the First New York Lawsuit was void insofar as it applied to Potasky Jeweler, and (2) the awarding of attorney's fees to the debtor for the appellant's violation of the automatic stay.

1. *Declaring the First New York Lawsuit void as to Potasky Jeweler*

It is undisputed that Greenblatt filed a lawsuit against Potasky Jeweler after the debtor had filed a petition for bankruptcy. It is further undisputed that Greenblatt, when he filed that lawsuit, had full knowledge that the debtor had filed a petition for relief with the bankruptcy court. Greenblatt contends, however, that, as he did not serve Potasky Jeweler with a copy of the complaint, he did not violate the automatic stay. (Doc. # 25–1, pgs. 11–12; C–3–94–103). Therefore, the bankruptcy court had no authority to declare the lawsuit void as it applied to Potasky Jeweler. This argument is without merit. All that the Code requires for a violation of the automatic stay is the *commencement* of a suit against the debtor. *See* 11 U.S.C. § 362(a)(1) ("[A] petition filed ... operates as a stay ... of the commencement or continuation ... of a judicial ... action or proceeding against the debtor"). Whether a copy of the complaint is *served* upon the debtor is immaterial. *See Glinka v. Dartmouth Banking Co. (In re Kelton Motors Inc.)*, 121 B.R. 166, 191 (Bankr.D.Vt. 1990). Therefore, by filing the lawsuit against Potasky Jeweler after it had filed a petition for bankruptcy, Greenblatt violated the automatic stay.

Absent the presence of limited equitable circumstances, actions taken in violation of the automatic stay are invalid and voided. *See Easley v. Pettibone Michigan Corp.*, 990 F.2d 905, 911 (6th Cir.1993). Such limited equitable circumstances are present "only where the debtor unreasonably withholds notice of the stay and the creditor would be prejudiced if the debtor is able to raise the stay as a defense, or where the debtor is attempting to use the stay unfairly as a shield to avoid an unfavorable result ...." *Easley*, 990 F.2d at 911. As none of

these circumstances are present in this case, the bankruptcy court acted appropriately when it declared the First New York Lawsuit void insofar as it applied to Potasky Jeweler.

2. *Awarding attorney's fees for violating the stay*

Although both parties apparently believe that the bankruptcy court awarded attorney's fees pursuant to § 362(h), (Doc. # 28, pgs. 12–13; Doc. # 17, pgs. 38–45), the court actually held that § 362(h) was inapplicable because the term "individual" in § 362(h) prevents corporations from seeking damages under that section of the Code. (Doc. # 26–1, pg. 1). Instead, the bankruptcy court awarded attorney's fees to Potasky Jeweler through the exercise of its broad equitable powers located in § 105. (Doc. # 26–1, pg. 1).

The fact that the court held it had no authority under § *362(h)* to award attorney's fees to the debtor does not mean that it completely lacked authority to take any action in response to the appellant's conduct. Section 105(a) provides the bankruptcy courts with broad equitable powers to effectuate the purposes of the Bankruptcy Code. However, any order issued pursuant to the equitable powers located in § 105(a) must be linked to another section of the Code.

The awarding of attorney fees to the debtor as a means of sanctioning a party who has engaged in a willful violation of the automatic stay is certainly linked to and effectuates the purpose of another section of the Code— § 362(a). Therefore, a bankruptcy court may award attorney fees to a corporate debtor pursuant to § 105(a), even though the court would be unable to accomplish the same task under § 362(h). In fact, every court that has considered the issue has found that § 105(a) provides the bankruptcy court with the power to award attorney's fees as a means of enforcing the automatic stay. *See Caldwell v. Unified Capital Corp. (In re Rainbow Magazine, Inc.)*, 77 F.3d 278, 283–85 (9th Cir.1996); *Havelock v. Taxel (In re Pace)*, 67 F.3d 187, 193 (9th Cir.1995); *Mountain America Credit Union v. Skinner (In re Skinner)*, 917 F.2d 444, 447–48 (10th

Cir.1990); *Burd v. Walters (In re Walters )*, 868 F.2d 665, 669 (4th Cir.1989); *Elder–Beerman Stores Corp. v. Thomasville Furniture Indus, Inc. (In re Elder–Beerman Stores Corp.)*, 197 B.R. 629, 632–34 (Bankr. S.D.Ohio 1996); *In re Bennett*, 135 B.R. 72, 78 (Bankr.S.D.Ohio 1992); 2 COLLIER ON BANKRUPTCY ¶ 105.04[1][a], at 105–58 to 105–59 (15th ed. rev.1996). Given the appellant's willful disregard of the automatic stay, the bankruptcy court's order awarding attorney's fees to Potasky Jeweler was not only a proper use of its discretion but was justified.

WHEREFORE, the Order of the United States Bankruptcy Court in Case No. C–3–94–103 is affirmed, in its entirety. The Judgment entered in favor of the Appellee and against Appellant herein, in the amount of $5,847.76 in attorneys fees, plus interest, as the result of the Appellant's failure to seek leave of the Bankruptcy Court when he initiated the First New York Lawsuit, thus violating the automatic stay, is affirmed.

C. *February 15, 1994 order relating to the First New York Lawsuit (Case No. 94–120)*

With respect to the bankruptcy court's February 15, 1994, order disposing of all the remaining issues concerning the First New York Lawsuit, Greenblatt has essentially raised the same objections as those raised with respect to the bankruptcy court's January 25, 1994, order dealing with the Second New York Lawsuit.

1. *Authority to grant the permanent injunction*

As Potasky Jeweler has raised the same justifications for the propriety of the permanent injunction with respect to the First New York Lawsuit as it did with respect to the second such, (Doc. # 21, pgs. 15–16), the Court concludes that it has failed to demonstrate that the injunction would have a direct and immediate connection to the property or the administration of the debtor's estate. Therefore, for the reasons set forth earlier, *see supra*, IV(A)(4), the bankruptcy court's order permanently enjoining Greenblatt from pursuing the First New York Lawsuit is reversed insofar as the injunction shields from liability any of the named defendants who are also third party non-debtors.[21]

2. *Order to dismiss or pay a fine*

As the court had no authority to issue the permanent injunction, the order of the bankruptcy court directing Greenblatt to dismiss the First New York Lawsuit with prejudice within 10 days or pay a fine is vacated. *See supra,* IV(A)(5).

WHEREFORE, the Orders of the United States Bankruptcy Court in Case No. C–3–94–120 are reversed. The Order of the Bankruptcy Court permanently enjoining the First New York Lawsuit is reversed insofar as the injunction benefits third-party non-debtors. The directive that the Appellant dismiss the First New York Lawsuit within ten days or pay a fine is vacated. Judgment will be ordered entered in favor of the Appellant and against Appellee.

---

**21.** Potasky Jeweler argues that the Barton rule provided the bankruptcy court with the necessary authority to grant the permanent injunction against the First New York Lawsuit. (Doc. # 21, pgs. 11–12). Potasky Jeweler's reliance upon the Barton rule is misplaced. That rule only serves to protect the trustee, counsel for the trustee or court appointed officers. *See DeLorean*, 991 F.2d at 1241. None of the parties to the First New York Lawsuit fall within this class of protected entities. Rather, with the exception of the debtor itself, all are *employees* of the debtor. Thus, the Barton rule is not applicable. Furthermore, unlike Potasky Jeweler, the Court does not envision the Barton rule as providing permanent immunity from suit for all the actions that are taken with respect to the administration of the estate. As the Supreme Court noted in *Barton:*

We therefore declare it as our opinion that when the court of one State has ... property

in its possession for administration as trust assets, ... *until such time as it can be sold with due regard to the rights of all persons interested therein,* a court of another State has not jurisdiction, without leave of [the appointing] court.

104 U.S. 126, 136–37 (emphasis added). Clearly the Supreme Court did not envision that the protection its rule afforded would be permanent. Instead, it viewed the rule as affording protection to the receiver until such time there were no longer any trust assets for the receiver to administer. Similarly, in the bankruptcy context, the application of the Barton rule should only afford protection until the bankruptcy proceedings are either dismissed, confirmed or closed. Therefore, when the bankruptcy court confirmed the debtor's plan of reorganization, any protection afforded by the Barton rule disappeared.

## D. October 4, 1994, contempt order (Case No. 94–541)

Greenblatt has argued that the bankruptcy court's order levying sanctions against him for being in contempt of court was in error for two reasons: (1) a bankruptcy court lacks the power to impose penalties for criminal contempt except in cases where the contempt occurs in the presence of the bankruptcy court; and (2) the notice the court sent to the appellant informing him of the contempt hearing was procedurally defective, as it did not comply with the requirements set forth in Bankruptcy Rule 9020(b).[22] (Doc. # 3, pgs. 10–13). This Court need not reach either of the appellant's arguments, as the bankruptcy court's contempt order by its very terms cannot stand.

In its notice to the appellant, the bankruptcy court characterized the nature of its contempt order as being civil in nature. *See* Doc. # 1–1, pg. 1 ("issuing an order of *civil contempt* against Martin Greenblatt for failure to comply with the court's prior order ....)" (emphasis added). Similarly, the debtor has argued that the contempt order was civil in nature. (Doc. # 5, pgs. 12–14). Since the court's order was civil in nature, it must be vacated according to the dictates set forth in *Collins* ("a finding of civil contempt is invalidated if the underlying order is invalidated."). *See supra*, IV(A)(5). Given that the underlying orders upon which the finding of contempt was based (an injunction forbidding Greenblatt from pursuing either New York lawsuit) have been vacated, the finding of contempt for violation of those orders must likewise be vacated. Therefore, the bankruptcy court's order imposing a fine of $1128.50 is vacated. In addition, the court's order directing judgment against the appellant in the amount of $22,000 for his failure to comply with its January 25, 1994, ruling is also vacated.

WHEREFORE, in Case No. C–3–94–541, the October 4, 1994, Order of the United States Bankruptcy Court is reversed. Judgment will be ordered entered in favor of the Appellant and against Appellee herein.

## V. CONCLUSION

In accordance with the foregoing, it is therefore

ORDERED that the bankruptcy court's orders permanently enjoining Appellate from pursuing the First and Second New York Lawsuit are reversed insofar as the injunctions benefit third party non-debtors. It is further ORDERED that the bankruptcy court's orders directing the Appellant to dismiss the First and Second New York Lawsuit within 10 days or pay a fine are vacated. Furthermore, it is ORDERED that the bankruptcy court's October 4 order imposing a civil contempt fine against the appellant and a further fine for failure to comply with the Court's Order of January 25, 1994, is vacated. In all other respects, it is ORDERED that the various orders of the bankruptcy court are affirmed. Appellee's request for costs is DENIED.

The captioned causes are hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

---

22. Greenblatt has also argued that the amount of the court's fine violated Bankruptcy Rule 920 which places a $250 monetary cap on the amount of a fine a court may impose. (Doc. # 3, pgs. 8–10). Appellant's reliance on Rule 920 is misplaced. That rule was superseded by Rule 9020 in 1990. As Rule 9020 contains no similar monetary limit on the amount of a fine the court may impose, appellant's argument is without merit.